Good morning, Illinois Appellate Court. First District Court is now in session. The Fourth Division, the Honorable Robert E. Gordon presiding, case number 1-9-2-6-1-9, consolidated with case number 1-9-2-6-2-0, Wendy Hartley v. North American Polymer Company. Would the lawyers who are going to argue the case please introduce yourself to the court? Yes, Your Honor, I am Rachel Kiley and I represent North American Polymer Company Limited, NAPCO, who is the defendant, third-party plaintiff, and one of the appellants in this matter. Are you going to argue for all the appellants? No, we're dividing our time. Okay, and how about the rebuttal? Are you dividing the rebuttal or is one person going to make a rebuttal? I think that we're just going to have one person making the rebuttal. Okay. Paul, is that correct? Anna, how much time do you need for that? We wanted to divide equally the 15 minutes for the main argument and then five minutes for rebuttal. It was our understanding that we only had 20 minutes total. Okay, that'll be fine. All right, and for the appellee, will you please introduce yourself to the court? Good morning, Your Honor. Eric Jones on behalf of the plaintiff appellee. My intention was to defer to my colleague, Matt Hargrave, as our interests are aligned on this in terms of the argument, unless of course the court has any specific questions directed at plaintiff, which I'm of course happy to answer. And I'm Matthew Hargrave. I represent third-party defendant appellee Tony Hartley doing business as Hartley's painting. And are you going to argue for all the appellees? Yes. Okay, all right, let's proceed. Okay. All right, may it please the court. My name is Rachel Kiley and I represent the defendant third-party plaintiff and appellant here North American Polymer Company Limited. This appeal is of the circuit court's November 26, 2019 order, wherein the circuit court actually reversed itself and granted third-party defendant Tony Hartley's motion for good faith finding. There are two main issues before the court today. The first issue is whether it was error for the trial court to find that the settlement of a under the Contribution Act, notwithstanding the fact that the settling party was related to the plaintiff and that there was an economic relationship, the settling party had significant liability and a $1 million insurance policy. Let me ask you this. What evidence was before the court that made them change its mind? Well, your honor, the courts wrote two written opinions that actually serve as a good roadmap as to where they thought that they made a mistake. The first basis for the mistake was a mistake of law and the second one was a supposedly critical mistake of fact. With respect to the mistake of law, the circuit court found that originally it had inferred from the family relationship the appearance of collusion rather than in the record. It's our contention that this is an abusive description because essentially the circuit court invented a legal standard that does not exist. Under the Worsing case, which is a second district case, but it was also adopted the analysis in the Ross case, which is a first district case, they stood for the proposition that when there was a disparity in the settlement amount with the potential liability, a close personal relationship, and the plaintiff chose not to sue the third party defendants directly, this gives rise to an inference of collusion and a suspicion of it. Neither of those cases, nor any case that I'm aware of, stands for the proposition that there has to be direct evidence of collusion where the plaintiff and the third party defendant are conspiring behind back doors. Rather, the appearance of collusion is sufficient. So the fact that the circuit court reversed itself on that shows that it applied the wrong legal standard. In fact, the relationships that were existing in the Worsing case and in the Ross case are not nearly as close as the relationship we have in the case at hand. In Worsing, they were close personal friends. In Ross, there was a patient-doctor relationship and there was some evidence of a potential psychological dependence that the plaintiff had on the physician. Here, in our case, the youngest student, Kevin Hartley, was working for his uncle, Tony Hartley. They saw each other on a daily basis. Tony Hartley was the brother of Kevin's father. Kevin's father also worked for Tony Hartley. He continues to this day to work for Tony Hartley. Kevin Hartley's brother, Michael, also worked for Tony Hartley. So not only was there a compelling close family relationship, a blood relationship, but there was also an economic relationship. Now, the appellees point out in the brief that the named plaintiff, decedent's mother, is divorced from the decedent's father. But that's really a red herring because two of the beneficiaries under the Wrongful Death Act are blood-related to Tony Hartley, see him on a daily basis, and work for him, and are presumably financially dependent on him. So this is a personal relationship that is far more extensive and far more pervasive than the ones that existed in Ross and in Worsing. And the fact that the court concluded that she made a mistake because there was not direct evidence of collusion, there were no two people conspiring behind closed doors, is just simply the wrong legal standard, and in and of itself is an abuse of discretion. The second basis for her ruling was that she made a critical mistake of fact. With respect to that, there was some confusion as to who provided Kevin Hartley, the decedent, with the respirator mask that he was using on the date in question. It was a half mask that was clearly insufficient. The mask was explicitly warned against in the product's warning label and also was a violation of the federal regulations monitoring use of this particular chemical. Initially, apparently, the court was under the impression that Tony Hartley supplied the mask to his nephew. There is a receipt that Kevin Hartley purchased the mask at Home Depot. Ultimately, that really doesn't make a difference who purchased the mask because Tosha came in and investigated the accident and found that Tony Hartley violated 13 federal regulations, 12 of which were serious. And those regulations focused on the failure to provide a safe workplace, the failure to monitor him, the failure to ensure that he had the correct respiratory equipment, i.e. was his nephew using the correct mask. And the court, interestingly enough, basically stated in her second opinion, reversing herself, that she did not properly assess potential liability because of who purchased this mask, which, by the way, we don't know because we never got to depose Tony Hartley if he reimbursed his nephew, if he instructed his nephew to buy that specific mask, if he used the same mask himself, thereby modeling it for his nephew. But putting all of that aside, she said that she did not result, or I'm sorry, that she did not properly assess potential liability hinging on this one small fact. And that in and of itself is arbitrary and unreasonable, especially when she stated in her opinion, quote, the first Ross factor still weighs in favor of Natville and Samox, the appellants here, but the fact that Kevin supplied his own respirator diminished Tony Hartley's potential liability, end quote. And that's on C1857 of the record. The first Ross factor that she was talking about is the reasonableness of the amount paid compared to the settler's fair share of liability. So essentially, on that factor, she still found an appellant's favor and found that Tony Hartley paid too little in light of his potential exposure, but yet reversed herself. This one fact changes everything approach just doesn't make sense and is illogical and an abuse of discretion. In addition to that, if you look at the totality of the- To be ensured that would keep them from automatically assuming that there was collusion. What does the case law say? What instance? Could there be a relationship and still the behavior and not be collusion? You're- I'm not aware of the case law specifically commenting on that. What it does comment on is when there's a close personal relationship and the plaintiff makes the decision not to sue that party. Those were the factors in Worsing and Ross. And under that unique fact situation, the close personal relationship gives rise when you take into consideration all of the other factors under the totality test. Your concern was the level of the settlement, that it was only $50,000 when there was $1 million to be had. So it was- That and the fact that the plaintiff failed to sue. Correct. And that's why it still needs to be viewed in conjunction with the rest of the test, the rest of the totality test. But here we have a family relationship, a blood relationship, an economic dependency. And we have a plaintiff who did not sue the family member. And we have the family member who's facing significant undeniable exposure here. I mean, for all intents and purposes, he failed his nephew. There were 13 violations here of federal regulations. He allowed his nephew to ignore the product's warning label. And if this court does not believe that on the record before it, that there's enough evidence to give rise to an appearance of collusion under this totality test, then that brings me directly to the second issue, which is the fact that we should have been permitted to do additional discovery. We requested here repeatedly the opportunity to depose Wendy Hartley, the mother who has since been deposed, and Tony Hartley. And to this date, we don't know what Tony Hartley is going to say. The court put a lot of emphasis on the fact that there was no evidence that the parties negotiated directly, rather it was done through their attorneys. What case do you know of where the clients are doing the negotiating and not the attorneys? And of course, we can't explore conversations between the attorney and client. So the only mechanism in place in order for us to probe those facts and find out what was going on and why they did not sue Tony Hartley is to take Wendy Hartley's deposition. And we were prohibited that opportunity. We now have the benefit of her testimony and it reinforces our position because she stated she didn't sue him because he was a family member. And we also have not gotten the opportunity to depose Tony Hartley, which goes to the supposed critical fact issue. To find out, Mr. Hartley, did you have the same mask? Did you model this mask for your nephew? Because at the end of the day, had his nephew been wearing the correct mask, Kevin would likely be with us today. So going back to the totality of the circumstances, it's our contention that all of those factors are in our favor. If you look at a settlement on a wrongful death case in Cook County, those cases typically settle or return verdicts in the six figures, if not the seven figures. Here we have a party with significant exposure as demonstrated by the Tosha violations. And your time is almost up. So you better sum up because you still have five minutes for rebuttal. Okay, well, for these reasons, we would ask that you reverse the circuit court opinion and I'll pass it to Mr. O'Flaherty. Thank you. Ms. Kiley, before you go, I just had one question. You said that the, and I've read that the, of course, the plaintiff's father were, or the deceased's father worked for Hartley and his brother. Wasn't there a sister too? I thought I recall reading that a sister were. There is a sister as well, but the sister does not work for Hartley Painting. Okay, thank you. Thank you. Okay, Justice Hall, do you have any questions? No, thank you. Thank you. Okay, let's hear from the appellee. Was Mr. O'Flaherty going to proceed? Yeah. If it pleases the court, I'd just like to make a couple of points quickly. Paul O'Flaherty for Sam Ax Enterprises. I am the other defendant, third-party plaintiff appellant here. At the risk of taking kind of a mechanistic approach to the flexible test of the totality of circumstances, it is interesting, hearkening back to Justice Gordon's initial question, to look at the new evidence that purportedly prompted the trial court to turn itself around on this in relation to the Ross factors. In her first opinion, finding that the settlement was not in good faith, she found that the first factor, the amount of the payment in relation to available resources and potential liability and exposure, weighed in favor of bad faith. She found in that first opinion that the existence of the family relationship raised a suggestion of collusion. And that also went into the bad faith column rather than the good faith column. The third factor in Ross, as the court well knows, is whether the third-party defendant was sued by the plaintiff. He was not. Judge Durkin put that in the bad faith column. And then the fourth factor, whether there was any concealment or misconduct or anything like that, Judge Durkin said in her first opinion that that was neutral. That was neither here nor there. So at the end of day one, so to speak, the score is three factors in favor of bad faith and one that's neither here nor there. So we move to the second factor. And she notes that maybe there was a factual mistake about who actually supplied Kevin's mask. But Judge Durkin still concludes, look at the very top of page four of her opinion, that that factor still weighs in favor of the non-settling parties. It still moves in, it still is a factor in favor of bad faith. The amount paid is still small in relation to the liability and exposure. She does talk about the family relationship, but she says she moves that from being a bad faith factor into neutral. And then she makes no further comment concerning the remaining two Ross factors, the fact that Tony Hartley was not sued by the plaintiff in this case, and the concealment issue. So the scorecard moves, so to speak, from three bad faith to one neutral. And in the second opinion, it's two bad faith to two neutrals. At no point did Judge Durkin ever conclude in proceedings below that any one of the factors actually pointed toward good faith. So you have to ask yourself whether that is really a proper application of the Ross factors. Thank you. Okay. Let's hear from the appellee. Thank you very much. May it please the court. This could like to just make sure everyone's clear. I know your honors are, this court reviews the trial court's judgment and not its rationale. So it's able to affirm for any reason supported by the record. The bottom line here is that the appellate record supports that the trial court didn't abuse its discretion in making the good faith finding. The complaint here is that we should have paid more money. No one says we couldn't have settled. They just think that we should have paid more without defining what more is. But as this court said in Daniel's opinion in December, 2019, the case law is clear that settlements aren't designed to benefit non-settling parties. They're created by the settling parties in their interests. And if the position of a settling defendant is worsened, that's the consequence of a refusal to settle. I'd like to point out one thing that I find important because it was raised in the reply brief and also by Ms. Kiley just now. And it's unfortunate because she refers to the testimony of Wendy Hartley taken long after the good faith findings were made. And it's frankly a false statement and I'm sorry to say it. NAPCO's brief at page eight of the reply says, while not part of the underlying record, Wendy Hartley admitted that she's elected not to sue Tony Hartley despite the Tosha report because he's family. That is false. The testimony of Wendy Hartley, even though it shouldn't be considered for the reasons that I stated in my brief, that question was whether she blames Tony Hartley and found he did anything wrong. She stated that the decision on who to sue was left to her attorneys and her attorney can certainly expound on that. But that is a misrepresentation of Ms. Wendy Hartley's testimony. It's just false. And I can't let that slide because it appears to be critically important since they raised it in their argument and in their brief. And I would say also with regard to the $50,000, no Illinois court has found $50,000 to be nominal or in bad faith. In the Johnson case, we had $1,000 settlement. In the Ross case, there was a $25,000 settlement which this court called modest, not even nominal. But in the Salini case, the court rejected an argument that's being made here by the appellants to compare what could happen in a Cook County jury trial with what this settlement is. The Salini case said that settlements may be substantially different from the results of litigation because damages are speculative and the probability of liability uncertain. That's what we have here. The Salini objecting parties tried to make the same argument. They said, look at how this plaintiff will ask for 10 to $20 million in this case. And that's why you should find that settlement to be bad faith. The court rejected that comparison. And in Johnson versus United Airlines, the seminal case on good faith findings, the Supreme Court said this disparity between a settlement and the ad damnum of the complaint is not an accurate measure of the good faith of the settlement. The Supreme Court has never altered that position. The appellate court has never altered that position. What it has found in certain circumstances, Worsing and Ross are the key cases that the appellants rely on, that the circumstances were just so outlandish that good faith couldn't possibly have existed. I go through in the brief, I think thoroughly in discussing why Ross and Worsing have nothing to do with this case. But really briefly, since Worsing appears to be important to the appellants, I mean, Worsing, the settling party drove a forklift and killed a person. There was a direct cause and effect relationship between the action of the settling party and the decedent where a $1,000 settlement was made and where no other reason, and I'm quoting from that opinion, no reason was given whatsoever as to why plaintiff didn't sue that party. And in Ross, you have completely kind of wild issues about psychological dependence on the doctor. But the key issue in Ross is, and the Babb case as well, is that those cases where a good faith finding was reversed, those are cases where the settling party retained a stranglehold on the future ability of any party to settle the case. In Ross, because it was a more than 25 times the amount of the settlement that the settling party held in Leans, and in Babb, it was because of a loan receipt agreement where the settling party had veto power over any future settlement. So we have nothing like that here in this case. The third party defendant holds no sway over future settlement in this case. And with regard to the liability question, the closeness of the relationship and the OSHA violations appear to be the critical factors. As to OSHA, I don't think anyone disputes that OSHA citations do not create a duty. The case law is clear, I cited in my brief. OSHA citations do not create a duty. So here's the problem with the OSHA argument for the appellants. In their briefs, they admit that Kevin Hartley, a nearly 22-year-old man who was working for Hartley's painting was an independent contractor. Now, what duty does a contractor owe to an independent contractor? None under the Carney case. I cited it in the appellee's brief. It was never refuted in any appellant's brief. There is no duty under this case. And so if there's no duty between the third-party defendant and the decedent, what matter are any of these OSHA violations? Because he didn't know the duty. And that dovetails in to a reason logically why plaintiff didn't sue the third-party defendant. Because if he is an independent contractor, the allegations that plaintiff would be making against the third-party defendant if sued directly are essentially proving the appellant's contributory negligence. And they're not required to do that. There's no case that holds that a plaintiff's got to sue everyone potentially involved in a situation. So there's a number of reasons why the plaintiff didn't sue third-party defendant, but that's one of them. Another one is that we would have mounted a significant personal jurisdiction defense if sued directly by the plaintiff. This is a Tennessee incident, Tennessee conduct, Tennessee parties other than NAPCO and SAMEX. So it's entirely possible that our claim would have been dismissed. And if plaintiff wanted to pursue it, he'd have to do so in Tennessee. So there are significant reasons why plaintiff did not sue the third-party defendant directly, not just because they were family and not even because they were family, because that was the attorney's determination. It was not Ms. Hartley's determination. Let me ask you this question. The Contribution Act seeks to promote two important public policies. One is the encouragement of settlements. And then is the equitable apportionment of damages among tortfeasors. How does the circumstances of this case serve the latter purpose? Absolutely. The equitable apportionment of damages is a co-equal and important public policy. Antonicelli, which is a Supreme Court case, says that that's accomplished by the right to a set-off. Here, there is no dispute whatsoever by plaintiff or myself that NAPCO and SAMEX would be entitled to a full $50,000 set-off at trial. There's no question about that. And the cases that take issue with the equitable apportionment of damages are cases where someone sought to interfere with that set-off possibility. So if the existence of the set-off alone didn't satisfy that concern, the requirement that the settlement be made in good faith serves to address that equitable apportionment issue by asking the trial court to assess the totality of the circumstances and ensure that it's considering, as one of the factors in the totality, the potential liability of the third party. And for the reasons that I set forth earlier, but also in the brief, it is very questionable that the third party defendant would have any liability, especially where the appellants have admitted the independent contractor relationship. So where is the duty is the question. And if we don't owe a duty, we're 0% liable as a matter of law, as the court notes. So in addition to that, that's a defense that we have. The Ross case says you consider everyone's defenses, settling parties and non-settling parties. NAPCO and SAMEX here have taken the position that they deny their product was being used. They deny it was dangerous. They allege misuse by the plaintiff and assert a bunch of other substantive defenses to liability. If they prevail, there's no contribution liability on the third party, none whatsoever. So I'm assuming those defenses are being made in good faith. They continue to maintain them. And if they prove them, then we owe zero in contribution. Well, I understand your argument, but the problem that I'd like to hear, some answers to is that there's a million dollar coverage here and you're offering $50,000. You know, that's what 5% of what the coverage is. I understand there's liability questions, but it's still a question that there could be liability. And you're right. It's possible that there may not be liability, but the 5% is troublesome. And that's fair enough. I would point out though, that no court has provided a formula for this. The Warsink case, and I think I go through this in my brief and analyze the percentages. I mean, the Warsink case had a, I think it was a 0.33% ratio of settlement to available insurance. Our ratio as your justice noted is 5%. There's been no formula prescribed by any court that asked someone to make that determination. So is it a million dollars? It's not. Is it $1? It's not. Is it the thousand dollars of Johnson, which was still good faith? It's not, certainly not that. It's 50 times that amount. So I don't know how to answer that really, other than to say it's real money. Well, you know, the courts have considered the factors and in regard to those factors, you know, it's still troublesome. I mean, how do you get around the factors and the evidence in this case? Well, I think that it's very clear how I see that we get around it by showing that first of all, did we even have a duty to this decedent? They keep referring to his nephew and the family. This is a 20, nearly 22 year old man who took independently,  where NAPCO sent him an email and said, you now have all the tools you need to succeed in this business. So he is not a nephew that, hey, his uncle's saying, come on over to my job site. I'll set you up for some bathtub refinishing. That's not the case. He was issued a 1099. He was working on his own on the date of the incident. He always worked on his own on these bathtubs. He was doing the work of a contractor. So to try to make this sound like it was a poor nephew who didn't know what he was doing, that's just not the case. And they point that out by their defenses. They point out all of these things that they say the third party defendant did wrong. These are actually defenses against the plaintiff. So I don't think that we have the liability that the appellants think that we have because of the duty issue and because all of those allegations go towards the plaintiff's conduct just as much as they do the third party defendant, if not solely to the plaintiff. So that's why the amount of the settlement bears a reasonable resemblance to the liability picture. But that's not the only thing that's considered. And so under the totality, the $50,000 is real money that the plaintiff may never get. If NAPCO and SAMHECS prove their allegations at trial, plaintiff gets $0 from me and from them. Does any other panel member have any questions? Oh, thank you. Justice Lamkin, do you have any questions? Okay, let's hear the rebuttal. Yes, Your Honor. I hope you can hear me. Pardon? Am I audible? Can I be heard? Yeah. Okay. Could everybody hear him? I think Justice Lamkin was trying to say something. Yes. I was trying to say something. My internet is unstable. Can you hear me? Yes. All right. I did want to ask Justice Hargrave because you're raising all these possible defenses. But my reading of the record, you didn't file an answer to the complaint. You just filed the request for the good faith finding for the settlement. I wanted to know if that was correct because I didn't see any. I didn't see you raising the defenses that you're arguing about now. And my other issue or question really is, was there a prayer for relief in terms of what the plaintiff was asking? How much was she asking in relation to this $50,000 settlement? I would like to know that if there was a request for relief or a prayer for relief in a certain amount. Sure, Justice. Second question first, if I may, because I think that one's easy. The prayer for relief in the complaint was the typical in excess of $50,000 jurisdictional amount. To answer your first question, the reason why we did not file an answer was because our responsive pleading to the third party complaint was essentially a 619 motion to dismiss on the basis that there was a good faith settlement. I concurrently with that motion to dismiss, it was a two-part motion. Number one was a motion to dismiss based on the settlement. Number two was a motion to dismiss pursuant to Tennessee law, where I argue that Tennessee law does not provide for third party contribution actions. So I raised that defense in the trial court right in the pleading. I did not get to the point of raising a defense of no duty in formal pleadings, meaning a responsive pleading, because we weren't at that stage yet. But I certainly raised all of these issues in the trial court and the appellate court in the briefs. All right. Thank you. Okay, now we can hear the rebuttal. Thank you, Your Honor. Again, Paul O'Flaherty for SAMHSA Enterprises Incorporated. I want to address myself to Mr. Hargrave's rhetorical question, where's the duty? Because there seems to be a central suggestion in his argument that if Kevin Hartley is an independent contractor, that's the end of his liability. No other duties are owed. And the record and legal principles and the evidence in this case all show the contrary. In addition to hiring Kevin Hartley as an independent contractor, Tony Hartley and Hartley's painting were the source of the white lightning stripper that Kevin was using and that ultimately took his life. So Mr. Hartley isn't just an employer or a quasi-employer. He is in the chain of distribution for this hazardous product. And what does that mean in terms of duty? We all know the classic elements for the imposition of a legal duty. What's the likelihood of harm? Very high if proper precautions aren't taken against this product containing methylene chloride. What's its foreseeability? Highly foreseeable, again, in the absence of proper precautions. What are the burden and consequences of putting a duty of care, a duty of ordinary care on the particular party? As is indicated by all the references to the Code of Federal Regulations in that Tennessee OSHA citation, these are burdens that are placed on everyone trafficking in or using methylene chloride-containing products. So there's nothing unusual about putting that burden on Mr. Hartley. And of course, the existence of duty depends on the relationship of the parties. And what we have here is Mr. Hartley is the supplier of this dangerous, potentially dangerous product. He's also Kevin Hartley's principal, if not sole source of work. There's a great disparity in experience. Mr. Hartley's much older. The record shows that he purchased this white lightning stripper product  Kevin's accident and Kevin's death. And he's undoubtedly kind of a professional mentor to Kevin Hartley. He's the guy who gave him the opportunity to get into the trade. He is almost certainly somebody Kevin looks to as a model in terms of what he's going to do. So the idea that, as Mr. Hartley said, that the fact that Kevin's an independent contractor, that's the end of the duty analysis, that makes absolutely no sense. And likewise, the kind of suggestion in the trial court's opinion that, well, if he didn't supply the mask, that's the end of his tort duty, that's equally nonsensical. What does ordinary care look like in a case like this? Again, I think the Tosha citation is very instructive. When you're using or trafficking in hazardous materials like this, there ought to be a protocol for how warnings on labels, material safety data sheets, instructions, how those things get implemented in the field. There should be effective training in order to make those things real. With respect to methylene chloride itself, there are specific regulations about that where he's supposed to be evaluating, monitoring and evaluating what the exposures are to ensure that Kevin is not going to be exposed to dangerously high levels of this dangerous chemical. And then I don't mean to gainsay the mask, but who supplied the mask, that is not the end of the duty inquiry here. As the Tosha citation indicates, there were many respects in which Tony Hartley violated the duty of ordinary care as a chain in the dangerous product, as the last link in the chain of distribution for this product. So again, I would come back and just in summary say, when you look at Tony Hartley's duty in its proper perspective, you know, $50,000 against an existing million dollar policy, that is a chasm, that is a huge gap between what is being paid and what the potential liability and exposure would be. And in line with your comments, Justice Gordon, I agree that completely ignores the second policy purpose of the Contribution Act to get at least some approximation of fair and equitable apportionment of damages among the defendants. And then, you know, looking at the remaining factors, you know, I doubt- You're well past your time, so you'll have to sum up. Okay, very well, Your Honor. Just if you look at all of the evidence and all of the factors here, the defendants have sustained by a preponderance of the evidence that this was not in good faith. If you look at all of those factors cumulatively, they compel the conclusion that this was a sweetheart deal for Uncle Tony. Yeah, are there any questions by the panel? Justice Hall? Justice Lampkin? No, same. Okay. Okay, is that the end of the rebuttal? Yes, Your Honor, unless there are questions. Well, we thank you for a very interesting case. The arguments and the briefs were right on point and we'll shortly have a decision on this case. And the court will be adjourned until the next case is called.